| | |
|---|---|
| RANDALL MCELHANEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:21-cv-00019 |
| | ) |
| DUSTIN WILLIAMS; WILLIAM | ) |
| STEPP; NATHAN BROWN; | ) |
| TIMOTHY MARTIN; JOHN | ) |
| PETTIT; and PUTNAM COUNTY | ) |
| SCHOOL SYSTEM, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM OPINION

Pending before the Court is Defendants' Amended Motion for Summary Judgment (Doc. No. 39) on Plaintiff's allegation of alleging violation of his constitutional rights and breach of contract. Because the Court finds that Defendants are entitled to qualified immunity on Plaintiff's First Amendment claim, and summary judgment is appropriate on his Fourteenth Amendment claim, those claims will be dismissed. Additionally, the Court will decline to exercise supplemental jurisdiction over the state law contract claim.

## I. Factual Background[1]

Plaintiff Randall McElhaney is the father of L.M., a student at Upperman High School and member of the girls' varsity softball team. The school is located in Baxter, Tennessee, and competes with other schools in the area in accordance with Tennessee Secondary School Athletic Association Rules. (Doc. No. 47, SUMF ¶¶ 1-3).

---

[1] The following facts are drawn primarily from Defendant's Statement of Undisputed Material Facts and Plaintiff's responses thereto. (Doc. No. 47).

Dustin Williams, the Head Coach of the girls' team, drafted a "Parent-player Information" sheet that was provided to all parents and students. Among other things, that sheet instructed that "playing time is a non negotiable for coaches to talk directly with parents about." (Doc. No. 39-1 at 1). The sheet also contained a paragraph for "Parents" that reads:

> "<u>Parents need to be supportive of the program on the field and off the field. In the stands and at home</u>. We understand every parent wants what is best for their child. <u>Please remember this program wants what is best for this team and we have to strive for that. We need parents to be supportive of other players, other players on the team, and the program</u>. By doing this the season will be a much more pleasant and enjoyable, result being the kids will gel more like a team instead of individuals, and parents will gel as well. Guarantee your child sees and feels negativity and it will affect how they perform on and off the field. Practices are closed on the field or in the gym. No Parents or legal guardians are allowed to attend practice. No parents are to interact with their child during the games . . . this means no parents in the dugout during the games and no parent coming to the dugout coaching or giving instructions. Again let's be positive and cheer the girls on the field.

(<u>Id.</u> at 3) (syntax and grammar in original) (emphasis added). The policies were in effect during all times relevant to this litigation, and Plaintiff understood those policies. (Doc. No. 39-3, McElhaney Depo. at 74-76).

On April 15, 2021, Plaintiff sent text messages to Coach Williams that Defendants characterize as being critical of L.M.'s playing time, her teamates, and coaching decisions. Plaintiff contends the messages were not meant to be criticism, but instead were simply his efforts to receive "an explanation of [Coach] Williams' decision in light of the data (player statistics)," and an attempt to "advocat[e] for his daughter." (Doc. No. 47, SUMF ¶ 5). Whatever characterization is proper, the following excerpts suggest the tenor of the text messages:

> "L"[2] came home and said she talked to you. You need to look at the books and find out which kid has made the least amount of errors on the team. I can tell you "L" is

---

[2] "L" is a reference to L.M.

with 0. You benched "L" out of 2nd base after I rebutted what Mike told you that "L" needed to under hand that ball to "A" at 1st in the Soddy Daisy Tournament and I said "L" had to throw it fast like that to get the girl out because if she wouldn't have the girl would have been safe. "C" has made two errors already at 2nd base and you had to get onto her during the Dekalb County game and she does not cover bases at all. She has no idea what she is doing. She got played over every one of her middle school years at 2nd. So you are benching an upper classman to put her there. That is not understandable at all. Your other 2 pitchers don't leave the field at all. I didn't understand when you took "L" out of the pitching circle why she didn't just trade places with "A" at 2nd the other night in Livingston. No matter who makes errors in the outfield you just leave them in there. They take bad angles and they don't catch the ball or they just run up and let it fall in front of them when they can make a play. . . . "L" is right here and said she doesn't disagree with any of what was just said. I told her this is what she should have said to you in the teachers lounge when she talked to you today."

Coach Williams responded:

"I am sorry you feel this way, and sorry that you don't understand that we are only trying to do what we feel like is best for our team currently. I don't feel like running down other players is the best way to approach the situation nor do I feel like questioning our programs structural integrity is beneficial for anyone involved. We enjoy having "L" on our team and appreciate her heart . . . she is a great kid and a joy to be around, but I am under no circumstances going to continue to justify our reasons for what we do inside of our program or what we feel like is best for us. It seems from the comments I have heard that have came from you outside the park that you are extremely displeased with how we are running the program and have an exponential amount of opinions on how we should be running it . . crazy we have to have that conversation at 6-0 in the district but everyone is entitled to their own opinion. It seems we have reached the boiling point and you have a couple of options . . . 1.) go talk to my administration about how you feel 2.) walk away from the program or 3.) allow us to continue working daily to do what we feel like is best for our program and support us instead of running us down. I will not have this conversation again and feel completely disrespected in how this is being handled."

Plaintiff replied:

'If you feel so disrespected, I would love for you to tell me how this [sic] would this situation should be handled any differently than discussing it with you instead of running to someone else… My arguments are backed up by stats…Just because someone hasn't cost you a game at 2nd base' doesn't mean that 'L' shouldn't be on the field….I have coached several teams in my past so its not like I don't' know what I'm talking about….I will never go to administration over a coach unless they

3

physically harm my kid. I don't believe in that. If I ever feel I need for my kid or kids to step away from a team I will pull them. Then we will have a decision to either not and play at all or have them transfer and play for someone else. My kids are no where near allstars and I don't treat them that way at all. I would like her [sic] for her to remain with the team but would also like to see her be able to contribute as well….In a nutshell maybe I shouldn't have said anything to you and maybe just let my kid to learn to talk with you and address all of her concerns."

(Doc. No. 39-2 at 2-13) (syntax and grammar in original). The exchanges were solely between Plaintiff and Coach Williams, but were shared by Plaintiff with L.M. Coach Williams also forwarded the exchanges to Williams Stepp, the Principal of Upperman High School.

After conferring with Plaintiff (in a meeting also attended by Athletic Director Nathan Brown), Principal Stepp decided that a one-week suspension from Plaintiff attending games would put some time and space between him and Coach Williams. Later, after speaking with Plaintiff briefly and telling him he would not intervene, Timothy Martin, the Deputy Director of Schools upheld the suspension decision. (Doc. No. 43, SUMF ¶¶ 6-8). Plaintiff then met with Corby King, the Director of Schools for Putnam County, but King, too, concluded that the suspension was appropriate. (Id. ¶ 9).

Notwithstanding the suspension, Plaintiff attended his daughter's softball game on April 20, 2021 and sat in the stands. (Doc. No. 46 as 3).[3] During the third inning, Principal Stepp approached Plaintiff and asked him to leave. As the two walked towards the gate, they were joined by School Resource Officer John Pettit. Frustrated that he was not allowed to watch his daughter play, Plaintiff said, "this is bullsh**." Officer Pettit reiterated that Plaintiff needed to leave the game, stating that

---

[3] The facts surrounding Plaintiff's attendance at this game are drawn from his brief. Because, however, they are statements of alleged facts, Plaintiff should have filed his own statement of undisputed facts under Local Rule 56.01 so that Defendants could respond. Nevertheless, they appear to be undisputed and are accepted as true for purposes of this opinion.

4

Principal Stepp was in charge of the school, and if he wanted Plaintiff to leave he would have to leave or be considered trespassing. Plaintiff's entreaty that he be allowed to watch the game from outside the gate was rebuffed and he left the ballpark to avoid risking arrest. (Id.). At no point did Officer Pettit touch or arrest plaintiff. (Doc. No. 43, SUMF ¶ 13).

## II. Application of Law

Based upon the above facts, Plaintiff alleges that he was retaliated against for exercising his free speech rights in violation of the First Amendment to the United States Constitution and Article I § 19 of the Tennessee Constitution, and denied due process in violation of the Fourteenth Amendment and Article I , ¶ 8 of the Tennessee Constitution. He also claims breach of contract based upon his paying $375 for a season ticket and his inability to attend games for a week.[4]

### A. Constitutional Claims[5]

#### 1. *First Amendment Claim*

"A First Amendment retaliation claim has three elements: '(1) the plaintiff engaged in protected conduct [i.e., constitutionally protected speech]; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse action was motivated at least in part by the plaintiff's protected conduct.'" Myers v. City of Centerville, 41 F.4th 746, 759 (6th Cir. 2022) (quoting Thaddeus-X v.

---

[4] This figure included $175 for preferred seating, a $150 players fee, and a $50 fee for not having to work the concession stands.

[5] Although Plaintiff brings both federal and state constitutional claims, "[t]here is no private right of action for damages under the Tennessee Constitution." Bennett v. Metro. Gov't of Nashville & Davidson Cty., (M.D. Tenn. 2019) (citing Cline v. Rogers, 87 F.3d 176, 179–180 (6th Cir. 1996); Bowden Bldg. Corp. v. Tenn. Real Estate Com'n, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999)). Plaintiffs only prayer for relief is $250,000 in compensatory damages, three times that amount in punitive damages, and attorney fees. Perhaps it was for this reason that Plaintiff's claims under the Tennessee Constitution are unaddressed in the parties' filings and will not be addressed at any more length here.

5

Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). Defendants argue that Plaintiff cannot establish a First Amendment retaliation claim and, in any event, they are entitled to qualified immunity on this claim. The Court agrees with the latter argument.

"Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights." DiLuzio v. Vill. of Yorkville, 796 F.3d 604, 608 (6th Cir. 2015). Once the defense is raised, a plaintiff must come forward with evidence from which a jury could find "(1) that the official violated a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). Both prongs must be met, and judges "can exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). Exercising that discretion here, the Court considers the second prong first and concludes that Plaintiff has wholly failed to establish that the law was "clearly established" under the circumstances of this case.

"'[C]learly established law should not be defined at a high level of generality'– it 'must be particularized to the facts of the case.'" White v. Pauly, 137 S. Ct. 548, 552 (2017) (internal citations and quotation marks omitted). This does not require a plaintiff to identify an earlier decision that is "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting al–Kidd, 563 U.S. at 741). "[T]his narrow definition of 'clearly established' functions to protect 'all but the plainly incompetent or those who knowingly violate the law.'" Mitchell v. Schlabach, 864 F.3d 416, 424 (6th Cir. 2017) (quoting Mullenix, 136 S. Ct. at 308). It also serves to protect "reasonable" but

6

"mistaken" decisions by officials acting in good faith. Hunter v. Bryant, 502 U.S. 224, 229 (1991).

It is the plaintiff's burden to show "that the right was 'clearly established' at the time of the challenged conduct." al-Kidd, 563 U.S. at 735 (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In the absence of a clear constitutional violation, the decision as to whether existing legal authority has placed the statutory or constitutional question beyond debate is determined by looking first to Supreme Court precedent, then to Sixth Circuit precedent, and then to decisions of other courts of appeal. Barber v. Miller, 809 F.3d 840, 845 (6th Cir. 2015); Flint v. Kentucky Dep't of Corr., 270 F.3d 340, 347 (6th Cir. 2001).

In an effort to show that his First Amendment right to freedom of speech was violated when the school barred him from attending a week's worth of games, Plaintiff "asks this Court to consider . . . the Second Circuit case of Frierson v Reinisch, 806 Fed. App'x 54 (2nd Cir. 2020)[.]" (Doc. No. 46 at 7). There, the court affirmed the denial of qualified immunity on a motion for summary judgment where a father of a basketball player was banned from attending games after he expressed his displeasure with the coaching staff during meetings with students and parents. Noting that it had previously found that when "a public school invites parents and other spectators to attend sporting events held in its gymnasium, the gymnasium operates as 'a limited public forum,'" the Second Circuit reiterated its position that a school may restrict access to such a forum "only when (1) 'its restrictions are reasonable and viewpoint neutral,' or (2) 'there is a clear and present danger of disruptions such as disorder, riot, obstruction of the event, or immediate threat to public safety.'" Id. at 58 (quoting Johnson v. Perry, 859 F.3d 156, 175 (2nd Cir. 2017)).

No doubt, the facts presented here are somewhat analogous to those in Frierson, not the least of which is that there has been no showing of a clear and present danger had Plaintiff been allowed

7

to attend his daughter's softball games during the week he was banned.[6] For a number of reasons, however, Frierson is insufficient as a matter of law to place the constitutional question beyond debate.

To begin, Frierson is an unpublished decision and this alone is sufficient to ignore it as precedential authority. The Sixth Circuit has explained:

> [A] plaintiff cannot point to unpublished decisions to meet []his burden. Basic logic tells us at least this much. After all, the qualified-immunity inquiry looks at whether a right has been clearly established. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate."
> . . . Yet how can an unpublished case place a question beyond debate when it doesn't even bind a future panel of this court? It can't.

Bell v. City of Southfield, 37 F.4th 362, 367–68 (6th Cir. 2022) (internal citations omitted).

Even if unpublished authority counted, Frierson could hardly be considered to have placed the issue beyond debate when an equally, non-controlling unpublished Third Circuit case reached the opposite conclusion on facts much more analogous to those presented here. In Blasi v. Pen Argyl Area Sch. Dist., plaintiff, the father of two highschool basketball players, sued the school district when he was banned from attending a game after he sent numerous "emails to coaches complaining about their coaching methods, the behavior of his sons' teammates towards them, and alleged favoritism toward white, inferior players." 512 F. App'x 173, 175 (3d Cir. 2013). Noting that

---

[6] The Court notes that, in its Memorandum of Law, Defendants assert:

> The events of this case all occurred against a backdrop known to the individual school Defendants, and particularly Principal Stepp, as Plaintiff in the past had a number of confrontations with staff employed by the Putnam County Board of Education where he acted as a bully and had been asked to leave softball games and school parent-teacher meetings. Plaintiff had been hostile in the past when he did not get his way.

(Doc. No. 40 at 4-5). Those allegations are not set forth in Defendants' Statement of Material Facts and therefore the Court does not rely upon them in reaching its conclusion because they may be disputed in whole or in part.

plaintiff's First Amendment claim was "made in the context of an athletic program in which his sons' participation, and by extension his own, is voluntary," and that "[p]laintiff was aware of and agreed to the standards required of students, and their parents, in order to participate in the School District's basketball program, including restrictions on the manner and tone of speech used with respect to coaches and other players, id. at 175, the Third Circuit found dismissal warranted. Among other things, the court noted that "[t]he narrower goals of an athletic team differ from those of academic pursuits and are not always consistent with the freewheeling exchange of views that might be appropriate in a classroom debate," and that "[s]chool officials have a legitimate interest in affording student athletes 'an educational environment conducive to learning team unity and sportsmanship and free from disruptions that could hurt or stray the cohesiveness of the team.'" Id. at 175.

Further, and again assuming that unpublished decisions could establish rights of which a reasonable official would know, it is likely that, of the two, Blasi would be given more purchase in this circuit. In arriving at its conclusion, the Third Circuit in Blasi specifically referenced the Sixth Circuit's decision in Lowery v. Euverard, 497 F.3d 584 (6th Cir. 2007), a case involving plaintiffs' removal from a highschool football team after a player criticized the coach and called for his dismissal. A couple of points from Lowery are worth noting. First,

> The contour of First Amendment protection given to speech depends upon the context. For example, it is beyond question that citizens have a First Amendment right to criticize the government's military policy. However, does this mean that an enlisted soldier has a First Amendment right to be disrespectful towards his commanding officer? To ask that question is to answer it.

Id. at 587. Thus, it was "overly abstract and also misleading" to characterize the qualified immunity issue in Lowery as being "whether it is permissible for school officials to engage in viewpoint

discrimination against student athletes[.]" Id. at 589.  Likewise, the Second Circuit statement in Frierson that "[i]t is well-established that the government may not retaliate against individuals for exercising their rights under the First Amendment" 806 Fed. App'x at 57-58 is too broad.  Rather, a better question is whether a reasonable official would believe that Plaintiff had an unfettered right to attend games after he criticized the coach and his opinions on how to run the softball team, just as the appropriate question in Lowery was whether there was a constitutional right to remain on the team after the player/plaintiff said he hated the coach and did not want to play for him.

Second, and somewhat related to the last point, there is a difference between what may be allowable in the classroom and what is permitted in the locker room or on the playing field.  As the Sixth Circuit stated in Lowery:

> The Supreme Court has held that student athletes are subject to more restrictions than the student body at large. . . . This greater degree of oversight is due to the differing natures of the classroom and playing field. One of the purposes of education is to train students to fulfill their role in a free society. Thus, it is appropriate for students to learn to express and evaluate competing viewpoints. The goal of an athletic team is much narrower. Of course, students may participate in extracurricular sports for any number of reasons: to develop discipline, to experience comradery and bonding with other students, for the sheer "love of the game," etc. Athletic programs may also produce long-term benefits by distilling positive character traits in the players. However, the immediate goal of an athletic team is to win the game, and the coach determines how best to obtain that goal.
>
>         \*                   \*                   \*
>
> The success of an athletic team in large part depends on its coach. The coach determines the strategies and plays, and "sets the tone" for the team. The coach, particularly at the high school level, is also responsible for providing "an educational environment conducive to learning team unity and sportsmanship and free from disruptions and distractions that could hurt or stray the cohesiveness of the team." The ability of the coach to lead is inextricably linked to his ability to maintain order and discipline. Thus, attacking the authority of the coach necessarily undermines his ability to lead the team.

10

497 F.3d at 589, 594 (internal citations omitted).

Plaintiff also misplaces reliance on the Supreme Court's decision in Mahoney Area Sch. Dist. v. B.L., 141 S.Ct. 2038 (2021) for the proposition that "[i]f a public display using vulgarity to protest a high school coaching decision enjoys First Amendment protection, then [his] private text message to [Coach Williams], which did not include profanity or vulgar language, must enjoy the same protection." (Doc. No. 46 at 11). Mahoney was decided on June 23, 2021, meaning that it could not have clearly established law for events that took place months before. Moreover, the speech at issue in Mahoney occurred via Snapchat pictures posted by plaintiff while at a convenience store, that were distributed to a non-school audience and were unrelated to any guidelines relating to expected conduct. Indeed, the Supreme Court identified "three features of off-campus speech" but "left for future cases to decide where, when, and how those features" may "call for First Amendment leeway." 141 S.Ct. at 2046. Nowhere did the Supreme Court suggest that school officials are relieved from the "affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place," even though, "[f]orecasting disruption is unmistakably difficult to do." Lowery, 497 F.3d at 506.

Defendants are entitled to qualified immunity on Plaintiff's First Amendment claim.

### 2. *Due Process Claim*

Plaintiff claims that he "was not afforded the opportunity to be heard at a meaningful time and in a meaningful manner," before being banned from his daughter's ball game for a week. (Doc. No. 46 at 18). Instead, he argues that "Defendants tried to pass the buck from coach to principal to various administrators, each one merely rubber-stamping the decision of the others." (Id.).

"The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any

11

person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a procedural due process claim, a plaintiff must establish that: (1) he has a property interest protected by the Due Process Clause; (2) he was deprived of this property interest; and (3) the state did not afford him adequate pre-deprivation procedural rights." Cahoo v. SAS Analytics Inc., 912 F.3d 887, 900 (6th Cir. 2019); accord Albrecht v. Treon, 617 F.3d 890, 894 (6th Cir. 2010).

"As the Supreme Court stated many years ago, 'the root requirement' of due process protection is 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.'" Daily Servs., LLC v. Valentino, 756 F.3d 893, 903 (6th Cir. 2014) "Property interests are not created by the Constitution," but, instead, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law[.]" Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985) (quoting Bd. of Regents v. Roth, 408 U.S., 564, 576 (1972)).

Plaintiff's claimed deprivation in this case is allegedly two-fold: he "had a property or liberty interest in his season ticket seating at his daughter's softball games and, more generally, a liberty interest in being in a public place." (Doc. No. 46 at 17). Insofar as Plaintiff claims to have had a property interest because of his season tickets, that fails. "A state breach of contract action is most clearly an adequate remedy for a property deprivation when the only basis for federal jurisdiction is that a state actor is one of the contracting parties." Ramsey v. Bd. of Educ. of Whitley Cty., 844 F.2d 1268, 1273 (6th Cir. 1988). Indeed, "it is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state into a federal claim." Taylor Acquisitions, L.L.C. v. City of Taylor, 313 F. App'x 826, 831 (6th Cir. 2009). Plaintiff has an adequate state law remedy to the extent his due process claim is based on an alleged breach of contract and, indeed, he

12

brings a separate claim for breach of contract.

Plaintiff's claimed liberty interest in being in public also fails. "The preponderance of federal district courts considering the issue have held that '[t]he opportunity to participate in extracurricular activities is not, by and in itself, a property interest,'" Brindisi v. Regano, 20 F. App'x 508, 510 (6th Cir. 2001) (citation omitted) and, "[i]n the context of due process claims, to this Court's knowledge, every court that has considered the issue has concluded that citizens, including parents, do not have a liberty or property interest in accessing school property." Ritchie v. Coldwater Cmty. Sch., No. 1:11-CV-530, 2012 WL 2862037, at *16 (W.D. Mich. July 11, 2012) (collecting cases).

"Only after a plaintiff has met the burden of demonstrating that he possessed a protected property or liberty interest and was deprived of that interest will the court consider whether the process provided the plaintiff in conjunction with the deprivation, or lack thereof, violated his rights to due process." Hamilton v. Myers, 281 F.3d 520, 529 (6th Cir. 2002). Because Plaintiff has not carried that burden, summary judgment will be granted on his due process claim.

## B. State Law Claim

With the dismissal of Plaintiff's constitutional claims, the Court will not retain jurisdiction over his state law claim against Defendants for breach of contract. Under 28 U.S.C. § 1367(c)(3), there is a "strong presumption in favor of declining to exercise jurisdiction over supplemental state-law claims after dismissing federal anchor claims[.]" Martinez v. City of Cleveland, 700 F. App'x 521, 523 (6th Cir. 2017). Although this presumption is not as strong where, as here, a motion for summary judgment has been filed and considered, this Court has declined to exercise supplemental jurisdiction in the vast majority of cases. Larson v. City of Algood, 390 F. Supp. 3d 874, 891 (M.D. Tenn. 2019) (collecting cases). Ultimately, however, the decision is a matter of

13

discretion. Harper v. AutoAlliance Int'l, Inc., 392 F.3d 195, 210 (6th Cir. 2004). The Court declines to exercise supplemental jurisdiction here because Plaintiff's breach of contract claim is the type of claim Tennessee courts routinely and skillfully consider and involves an agreement (or not) between locals. In the absence of any federal jurisdiction, fairness and comity dictate that the Tennessee courts should be given the opportunity to decide that controversy.

### III. Conclusion

On the basis of the foregoing, the Court will grant Defendants' Amended Motion for Summary Judgment (Doc. No. 39) on Plaintiff's constitutional claims and decline to exercise jurisdiction over Plaintiff's state law claim.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE